## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**DOROTHY GIBBS,**

           **PLAINTIFF,**

**v.**

**MEGAN J. BRENNAN**, **POSTMASTER GENERAL OF THE UNITED STATES POSTAL SERVICE, A FEDERAL AGENCY,**

           **DEFENDANT.**

Civ. No. 18-14410 (KM) (MAH)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**[1]

     Dorothy Gibbs is an employee at the United States Postal Service ("USPS"). She brings claims under Title VII, claiming that USPS demoted her from Postmaster to Mail Handler because of her gender and because she opposed sexual harassment. USPS moves for summary judgment.

---

[1]     Citations to certain items in the record will be abbreviated as follows.: "DE" = Docket entry number in this case.

MSJ = Defendant's Brief in Support of its Motion for Summary Judgment (DE 48-1)

Opp = Plaintiff's Opposition to Defendant's Motion for Summary Judgment (DE 54)

Reply = Defendant's Reply Brief in Further Support of its Motion for Summary Judgment (DE 59)

Am. Compl. = Plaintiff's Complaint (DE 1)

DSOMF = Defendant's Statement of Facts (DE 48-3)

PSOMF = Plaintiff's Supplemental Statement of Facts (DE 53)

PRSOMF = Plaintiff's Response to Defendant's Statement of Facts (DE 55)

DRSOMF = Defendant's Response to Plaintiff's Supplemental Statement of Facts (DE 59-5)

The facts are sharply disputed. USPS points to substantial evidence that it demoted Gibbs because she failed to report sexual harassment and because she improperly coerced a subordinate into entering paying her a private settlement of $10,000. Gibbs, however, points to substantial evidence that these events did not occur as described, or that they were not the true basis for her demotion. On this summary judgment motion, I am required to construe the facts in Gibbs's favor. USPS's motion for summary judgment is therefore **DENIED**.

### I.      BACKGROUND

### A. Dorothy Gibbs

Ms. Gibbs joined USPS as a clerk in January 1995. (PSOMF ¶¶ 1–2.) A series of promotions resulted in her becoming a Level 17 Supervisor at the Fort Lee, New Jersey postal facility. (*Id.* ¶¶ 3–4; DSOMF ¶ 4.) On August 23, 2014, Gibbs was promoted to Postmaster of the Demarest, New Jersey post office. (DSOMF ¶ 4.) She would subsequently become Postmaster at the Elmwood Park and Bergenfield, New Jersey post offices. In December 2017 she was demoted to a Mail Handler position in connection with the events which are at issue in this case. (*Id.* ¶¶ 6–7; DE 48-4.)

### B. Gibbs is Allegedly Sexually Harassed by Her Subordinate

In September 2014, on Gibbs's final day at the Fort Lee branch, she said her goodbyes to her fellow employees. (PSOMF ¶ 6.) While she was saying her goodbyes, she was approached by a male letter carrier named Issa Nesheiwat ("Nesheiwat"). (*Id.* ¶ 7.) Gibbs was one of Nesheiwat's supervisors at the Fort Lee facility. (*Id.*) The parties dispute what happened next.

On Gibbs's account, Nesheiwat shook her hand and pulled her closer to him for a hug. (*Id.* ¶ 9.) During the hug, he grabbed her buttocks. (*Id.*) He then kissed her. (*Id.* ¶¶ 9–10.) Gibbs pushed him away and stood there, shocked. (*Id.* ¶ 11.) Other letter carriers then yelled at Nesheiwat, calling him a "pervert." (*Id.* ¶ 12.) Gibbs left the common area and went to the bathroom and cried. (*Id.*

¶ 13.) After composing herself, she returned to the post office common area, where several other letter carriers approached to ask if she was okay. (*Id.*)

Gibbs asserts that she called the Postal Service Equal Employment Opportunity office in order to report the incident. (*Id.* ¶¶ 24–25.) She claims that, during her call, she spoke with an individual who told her that she could not file an EEO charge against Nesheiwat because he was her subordinate. (*Id.* ¶ 27.)

Gibbs also states that she spoke with two individuals employed at USPS about the incident. First, on the day of the incident, she spoke with Roberto Caminero, an acting supervisor at the Fort Lee facility. (*Id.* ¶ 29.) Caminero told Gibbs that he had heard about the incident and was "going to take Nesheiwat in, because he knows better." (*Id.* ¶ 31.) Gibbs never heard from Caminero again regarding the harassment or any actions he took against Nesheiwat. (*Id.* ¶ 33.) Caminero resigned from the Postal Service in 2015. (*Id.* ¶ 33 n.2.)

Gibbs also claims that she spoke with Nesheiwat's union representative, Frank DeGironimo, on either the day of the incident or the next day. (*Id.* ¶ 34.) She states that DeGironimo had already been informed about Nesheiwat's conduct and that he apologized on Nesheiwat's behalf. (*Id.* ¶ 35.) Gibbs claims that she told DeGironimo that she had been informed that she could not file an EEO charge against Nesheiwat and so was going to file a civil suit instead. (*Id.* ¶ 36.)

The USPS denies that Nesheiwat groped Gibbs's buttocks or kissed her. (DRSOMF ¶¶ 9–10.) It also rejects Gibbs's characterization of her conversation with DeGironimo. (*Id.* ¶¶ 30–36.) It does not directly provide its own version of events, but instead refers to an investigation, detailed below, which failed to corroborate Gibbs's allegations. (*Id.*)

## C. Nesheiwat Agrees to Pay Gibbs $10,000

According to Gibbs, a week after the alleged sexual harassment, Nesheiwat called her to say that he wanted to settle their dispute. (PSOMF ¶¶ 37, 40.) Gibbs asserts that Nesheiwat said he had spoken to his sister and a

lawyer, and he wanted to pay her because he knew what he had done was wrong and because his lawyer had advised him that he would lose if the case went to court. (*Id.* ¶¶ 38–39.) After two subsequent discussions, Gibbs and Nesheiwat agreed to a $10,000 settlement. (*Id.* ¶ 41.)

At Gibbs's insistence, the settlement was reduced to writing, and the parties signed the agreement in the presence of a notary on September 25, 2014. (*Id.* ¶¶ 42–43.) On the agreement, Gibbs wrote "I was not inadvertently touched. Issa Nesheiwat was full[y] aware of his wrong[]doing of touching my butt, which is a sexual harassment charge. I have agreed to settle out of court with him for a settlement of $10,000 total." (*Id.* ¶ 45.)[2] Nesheiwat then paid the $10,000 in three installments. (*Id.* ¶ 46.)

According to Gibbs, she told DeGironimo about the settlement around the time that she entered it. (*Id.* ¶ 12.)

The USPS again cites its investigation, detailed below, which it claims did not corroborate Gibbs's allegations.

### D. USPS Learns of the Settlement and Conducts an Investigation

In September of 2016, the National Association of Letter Carriers ("NALC") and USPS learned of the alleged sexual harassment and the settlement agreement. (DSOMF ¶ 12.) The Executive President of NALC Branch 425, Albert Valvende, heard a rumor that Gibbs had extorted money from Nesheiwat and contacted DeGironimo and Nesheiwat to confirm. (DE 48-7 at 3.) He then reported the incident to the Postal Inspection Service. (*Id.*) In his report, Valvende described his discussion with Nesheiwat, in which Nesheiwat explained that he did not report the incident to authorities at first because he was afraid of Gibbs, who had threatened him with job loss and physical violence by her husband. (*Id.*) Gibbs disputes that she ever told Nesheiwat that her husband would hurt him or that he would lose his job if he did not settle with her. (PSOMF ¶¶ 48–49, PRSOMF ¶ 92.) She also claims that USPS only

---

[2] Nesheiwat would later claim that he did not agree with this portion of the agreement but did not object. (DSOMF ¶¶ 89–90.)

learned of the settlement agreement because DeGironimo called Nesheiwat and told him that he should file a grievance. (PSOMF ¶¶ 50; DE 53-2 ¶ 12.)

The USPS immediately requested an investigation by the USPS Office of the Inspector General ("OIG"). (DSOMF ¶ 14.) Special Agent Steven Vargas and Inspector Gerard Kane of the OIG carried out the investigation, which lasted from September 21, 2016 to October 27, 2016, and concluded with a report issued on October 31, 2016. (*Id.* ¶¶ 15–16.)

Vargas and Kane first interviewed Nesheiwat on September 21, 2016. (*Id.* ¶ 16.) In the interview, Nesheiwat denied inappropriately touching Gibbs. In his version, he gave Gibbs a hug in the presence of other people, including the Postmaster and the Shop Steward. (*Id.* ¶ 17.) He claimed that Gibbs then called him a week after she changed jobs to accuse him of inappropriately touching her. (*Id.* ¶ 18.) According to Nesheiwat, Gibbs then mentioned the possibility of filing a complaint against him and threatened that she had connections within USPS who could have him fired. (*Id.* ¶¶ 18–20.) She then asked him to pay $15,000; after negotiations, he ultimately agreed to pay $10,000. (*Id.* ¶¶ 21–22.) Nesheiwat never provided a clear explanation for failing to report the incident to management or local authorities. (*Id.* ¶ 24.)

Nesheiwat also provided investigators with a written statement dated September 13, 2016, in which he reiterated his account, but added that Gibbs threatened that her husband might hurt Nesheiwat. (*Id.* ¶¶ 25–27 (worrying that her husband "would get involved, but Gibbs did not want him going to jail").) He also wrote that Gibbs called his mobile phone during work hours and showed up unannounced at his work station to demand the money. (*Id.* ¶¶ 28–29.)

On September 29, 2016, Vargas and Kane also interviewed Gibbs as a part of their investigation. (PSOMF ¶ 52.) In that interview, Gibbs claimed that Nesheiwat grabbed her behind on her last day and that she pushed him away and yelled "why did you do that?" (*Id.* ¶ 32.) She claimed other letter carriers were present and yelled the same thing. (*Id.* ¶ 33.) The parties dispute whether

5

Gibbs provided the investigators with the names of the carriers who allegedly observed the incident. (DSOMF ¶ 34 (citing DE 53-14 at 4); PRSOMF ¶ 34 (citing DE 53-2 ¶ 6).)

Gibbs also claimed to have contacted EEO to file a sexual harassment complaint. (DSOMF ¶ 35.) She explained, however, that the EEO advised her that she could not do so against a subordinate. (*Id.*)[3] She acknowledged that she did not report the sexual harassment to local authorities, OIG, the Postal Inspection Service, or other high-level USPS management officials. (*Id.* ¶ 36.) The investigators reported that Gibbs was unable to provide a clear explanation for her failure to report, other than to state that she felt it was a personal matter. Gibbs, however, contests that characterization and claims that she stated that she did report the harassment. (*Id.* ¶ 37; DE 53-2 ¶ 7.) It is not clear from Gibbs's submissions, however, whether she claims to have specifically stated at this time that she reported the harassment to Caminero, DeGironimo, or the EEO. (*See* DE 53-2 ¶ 7 (Gibbs's affidavit in support of statement of facts) ("I told Vargas clearly that I had reported the assault") (omitting to whom the assault was reported).) She further declined to discuss the particulars of her settlement agreement with the investigators because her attorney was not present. (DSOMF ¶ 39.) She acknowledged conferring with NALC Shop Steward Frank DeGironimo regarding the harassment, but said that she did not provide DeGironimo any details. (*Id.* ¶ 38.)

The OIG investigators then concluded their report and provided it to USPS management. (*Id.*) On November 3, 2016, a week after the investigation concluded, Post Office Operations Manager Maryanne Batten placed Gibbs on administrative leave. (PSOMF ¶ 53.)

---

[3] During the interview she could not provide any identifying information regarding the EEO representative, though at a later hearing she stated she spoke to a female. (PRSOMF ¶ 53.)

### E. Nesheiwat Files a Grievance Against the USPS

On November 22, 2016, NALC filed a grievance against the USPS on Nesheiwat's behalf, alleging violations of the Employee Labor Relations Manual and the Joint Statement on Violence and Behavior in the Workplace because Gibbs, while acting in a supervisory role, negotiated a $10,000 payment from Nesheiwat. (DSOMF ¶ 42.) Arbitrator Joseph Harris, PhD, issued an arbitration award in favor of the NALC and directed USPS to remove Gibbs from her administrative duties for a period of three years starting on July 14, 2017. (*Id.* ¶ 43.) The USPS then unsuccessfully sought to obtain the $10,000 from Gibbs as indemnification for the arbitration award. (PSOMF ¶¶ 79–83.)

Although invited to testify, Gibbs did not appear at the arbitration hearing. (PRSOMF ¶ 43; DRSOMF ¶ 79; *see* DE 53-17 (email from union representative to Batten and others stating that Gibbs received an invitation to attend but that she could not because she would be on annual leave at that time).)

### F. OIG Performs a Supplemental Investigation

Between January 26, 2017, and March 8, 2018, while the result of the arbitration between NALC and USPS was still pending, Vargas and USPS-OIG Special Agent Bryan Glinkin conducted a supplemental investigation. (DSOMF ¶ 44.) As a part of that supplemental investigation, Glinkin conducted an additional interview with Gibbs on January 26, 2017. (*Id.* ¶ 45.) During that interview, Gibbs reiterated the events that she described in the September 29, 2016 interview. (*Id.* ¶¶ 45–49, 52–55.) The parties generally agree that, in this interview, Gibbs named other letter carriers who she claimed were present at the time of the harassment incident. (DSOMF ¶ 50; PRSOMF ¶ 50.)[4] They disagree, however, as to which individuals she named: USPS states that Gibbs identified Karen Andersen, Alexis Espino, Will Ramos, and Robert Ramos; Gibbs says that she identified Robert Ramos as having been present when her

---

[4] As mentioned, the parties dispute whether Gibbs named these individuals in the first interview. (*Id.*)

buttocks were grabbed, and stated that she was not sure if Will Ramos was present. (PRSOMF ¶ 50.)[5]

Gibbs also told the investigators that she spoke with Acting Supervisor Robert Caminero about the alleged incident. (DSOMF ¶ 51.)[6] She also elaborated on her conversation with DeGironimo, adding that she had told DeGironimo that she was going to file a civil suit against Nesheiwat, and that DeGironimo had told her he was already aware of the alleged incident. (*Id.* ¶ 56.)

Vargas and Glinkin also reinterviewed Nesheiwat on January 26, 2017. Nesheiwat claimed that he gave Gibbs a hug and a kiss on the cheek. (*Id.* ¶¶ 68–69.) He could not identify any witnesses with confidence. He mentioned that DeGironimo may have been nearby, and that Karen Andersen and Alexis Espino might have been present as well. (*Id.* ¶¶ 70–72.) Nesheiwat then claimed that a week and a half after Gibbs left Fort Lee, she called him to accuse him of inappropriately touching her. (*Id.* ¶ 73.) He claimed that he told her he was surprised and that if he had touched her inappropriately, it was an accident. (*Id.* ¶ 74.) Gibbs, he said, responded that she knew he had done it on purpose and that she might file a sexual harassment claim. (*Id.* ¶¶ 75–76.) Nesheiwat also said that Gibbs referred to knowing someone who could have him fired from USPS. (*Id.* ¶ 78.)

---

[5] The dispute emanates in part from the manner of questioning. Gibbs orally stated that Robert and Will Ramos were there. Gibbs was asked to point out individuals on a picture roster, but it does not appear that investigators made a clear record of which individuals she pointed at. The transcript does generally indicate that she pointed at other individuals on the roster. (*See* DE 53-3 T14:25–15:5 ("I don't see all the names here. I don't know this, I don't remember this name (indicating). There's another guy, I don't remember his name. There's another guy, he's African-American, he has dreads, and he's not here, but this doesn't look like all the names."); *id.* T15:10–13 ("These two I think was there (indicating) and I don't see Robert Ramos's name on here, neither. I see Will Ramos, he was there that day, but I'm not for sure if he was standing there.").

[6] The OIG never interviewed Caminero because at that point he was no longer employed with USPS, having left the Postal Service in 2015. (*Id.* ¶ 168.)

Nesheiwat told investigators that, at the time, he was unable to contact his attorney, who was on vacation. (*Id.* ¶¶ 83, 87.) He claimed to have contacted DeGironimo, who, he explained, already knew about the alleged incident. (*Id.* ¶ 84.) Nesheiwat claims that DeGironimo said he would speak to a union attorney and get back to him; a few days later, however, DeGironimo told Nesheiwat that he was on his own. (*Id.* ¶¶ 85–86.)

Vargas and Glinkin also interviewed DeGironimo. (DSOMF ¶ 96.) DeGironimo explained that Gibbs spent her last day going around the Fort Lee post office saying goodbye to carriers and giving them hugs and kisses. (*Id.* ¶ 98.) He stated that he did not recall it being a "big deal" and that he did not recall any confrontations or yelling. (*Id.* ¶ 99.) He explained that three weeks after Gibbs left Fort Lee, she told him that Nesheiwat had grabbed her buttocks while she was saying goodbye. (*Id.* ¶ 100.) He said that Gibbs mentioned Nesheiwat would pay her to end the matter and that while she did not want to hurt Nesheiwat or get him fired, she could not let it go. (*Id.* ¶ 102.) She also told DeGironimo that she had prevented her husband from assaulting Nesheiwat. (*Id.* ¶ 103.) DeGironimo told Gibbs that he was not aware of the incident and did not want to get involved. (*Id.* ¶ 104.) DeGironimo then claimed to have conferred with Nesheiwat, whom he described as "distraught." (*Id.* ¶ 106.) According to DeGironimo, Nesheiwat said that he gave Gibbs a hug and a kiss, but had agreed to pay her $10,000 to end the matter. (*Id.* ¶ 107.) DeGironimo advised Nesheiwat to retain an attorney and not pay Gibbs. (*Id.* ¶ 108.)

Vargas and Glinkin also interviewed some of the individuals identified by Gibbs and Nesheiwat as potential witnesses. They first interviewed Karen Andersen on March 8, 2017. (*Id.* ¶ 111.) Andersen recalled Gibbs's last day at Fort Lee, but did not remember any yelling or confrontations. (*Id.*) Second, Vargas and Glinkin interviewed Alexis Espino, who explained that he did not personally witness the incident, but recalled that Gibbs told him about it at a bar in Hoboken after her last day in Fort Lee. (*Id.* ¶ 115.) He stated that Gibbs

told him, Caminero, Will Ramos, and an individual named Keisaun William about the incident. (*Id.*) Espino recalled that Gibbs told them that Nesheiwat had touched her buttocks, but he did not recall her appearing upset or serious, and he did not receive any indication that she planned to take action against Nesheiwat. (*Id.* ¶¶ 116–17.) Third, Vargas and Glinkin interviewed Keisaun Williams, who stated that he did not observe the incident, but learned about it in August 2015 from Will Ramos. (*Id.* ¶ 119.) Fourth, and finally, Vargas and Glinkin interviewed Will Ramos, who stated that Gibbs never mentioned the incident to him and that he had learned about it from another employee. (*Id.* ¶ 120; Ex. H to MSJ (DE 48-11) at 7.)

### G. Gibbs is Demoted and Her Pay is Reduced

On June 10, 2017, Batten informed Gibbs of the allegations against her and issued her a letter of proposed reduction in grade and pay. (PSOMF ¶¶ 56–57.) Batten's letter seemingly did not take a position as to the truth of the harassment allegations, but criticized Batten for mishandling the situation:

> This demotion action is based upon your action, and also your failure to take certain actions . . . . [A]s a management official you have an affirmative duty to report any incidents of sexual harassment or sexual assault so that the incident can be immediately and fully investigated.

> You have consistently and uniformly taken the position that Mr. Nesheiwat's July 2014 actions were illegal and even criminal . . . . Yet, to this day you never reported what you had perceived and have characterized as the actions of the perpetrator of sexual assault so that it could be promptly and fully investigated. For example, you never reported the Nesheiwat incident to the Fort Lee Postmaster, to your POOM, to your District Manager, to your Human Resources manager, to your Labor Relations manager, or to the Office of Inspector General or the Postal Service Inspection Service. By failing to contact the relevant authorities you let a man who you perceived and regarded as someone who committed a sexual assault go uninvestigated, thereby putting other Postal Service employees potentially at risk for repetition of his action, if, indeed, he had committed a sexual assault. Your failure to act at all prevented a timely investigation from occurring.

10

> In contrast to your total inaction with respect to fulfilling your responsibilities as a supervisor to ensure that an investigation occurred, you were very active in pursuing and advancing your own selfish interests and self-enrichment. At the time that the incident occurred Nesheiwat was your subordinate. You threatened him with a civil lawsuit unless he agreed to pay you money. You then engaged in adversarial settlement negotiations with Nesheiwat in which you demanded a certain amount of money . . . . you also demanded that certain language be included as a condition of not filing a lawsuit against him in court . . . .
>
> Your failure to act to have the incident investigated and your threat to sue your subordinate . . . make you unfit to continue to serve in a position of management where you will be supervising any letter carriers or any other craft employees.

(Batten Letter, Ex. A to MSJ (DE 48-4) at 1–3.)

Batten cited Publication 552, entitled "Manager's Guide to Understanding, Investigating, and Preventing Harassment," which requires supervisors, like Gibbs, to conduct a thorough investigation into harassing behavior, including interviews of all parties involved and all witnesses to the alleged misconduct, and eliminate harassing behaviors. (DSOMF ¶ 122.) She stated that Publication 552 requires supervisors "to take action in the face of harassing behavior . . . . You cannot ignore the problem, because it may likely continue." (DE 48-4 at 2 ("Batten Letter").)

Batten's proposal was then sent to Batten's superior, Milford Scott Hooper, USPS District Manager for Northern New Jersey, for review. (PSOMF ¶¶ 62–64.) Hooper approved the proposed demotion, making it official, in a December 2017 decision. (*Id.* ¶ 65; DSOMF ¶ 125.) Hooper's written decision largely reiterated the reasoning set forth in Batten's proposed notice of reduction. (*See generally* Ex. E to MSJ (DE 48-8) ("Hooper Letter").) Hooper noted that he could "no longer trust that [Gibbs] will make the appropriate judgments in any supervisory or managerial position" in light of the fact that Gibbs "abused [her] superior position of power and authority to pressure an employee of lower rank and authority to pay you $10,000 secretly" and "let a man who [she] perceived and regarded as someone who committed a sexual

11

assault go uninvestigated, thereby putting other Postal Service employees potentially at risk for repetition of his action, if, indeed, he had committed a sexual assault." (*Id.* at 2–4.) He further found that Gibbs had not expressed remorse, so rehabilitation was unlikely to be successful. (*Id.*) As a result, Gibbs was demoted from Postmaster to Mail Handler and her salary was cut by more than $40,000. (PSOMF ¶ 66.)

### H. Gibbs Appeals the Demotion Decision to the MSPB

Gibbs appealed Hooper's decision to demote her by filing an appeal with the United States Merit Systems Protection Board ("MSPB") on December 23, 2017. (DSOMF ¶ 130.) The MSPB conducted a hearing and issued a decision denying Gibbs's appeal.

Randall Laib, an EEO Data Analyst at the National EEO Investigative Services Office ("NAISO"), testified at the MSPB hearing. (DSOMF ¶ 135.) He explained that the NAISO handles all EEO complaints and contacts made to the EEO, and that he acts as administrator of the EEO centralized intake system. (DSOMF ¶ 137.) He explained that when an individual calls the EEO hotline number, a recorded script asks for the caller's Employee Identification Number ("EIN") or Social Security Number. (*Id.* ¶ 138.) Afterwards, the caller is prompted to supply his or her name, address, and finance number, which identifies the facility where the caller works. (*Id.* ¶ 139.) Laib explained that a live person never comes on the EEO line and that every call ever made to the hotline is recorded. (*Id.* ¶ 140.)

Laib then explained that he used Gibbs's name, EIN, and Social Security Number to attempt to identify any calls made by Gibbs to the hotline. (*Id.* ¶ 142.) He identified eight instances associated with calls made by Gibbs, but none of them were made in 2014, the year that Gibbs claimed to have called the hotline. All but one of the Gibbs-identified calls occurred before 2014, and

the last occurred in 2015. (*Id.*) Thus, there was no record of Gibbs contacting EEO in 2014. (*Id.* ¶ 136.)[7]

Gibbs asserts that rather than contacting the NAISO number, she contacted the EEO field office in New York City. (*Id.* ¶ 144.) Laib acknowledged that he would not know whether Gibbs called that office, as such a call would not be registered in the NAISO system. (Tr. of MSPB Hearing (DE 48-16) T83:25–84:4.) He also addressed Gibbs's claim that she contacted the local EEO office rather than the hotline number, explaining that although the EEO has a Field Office in New York City, that office would ordinarily handle cases at the informal stage of processing after a case had proceeded through NAISO. (*Id.* ¶ 144.)

Gibbs produced a letter issued to her by Kathy Thomas of the New York EEO field office, which stated that a management official cannot file an EEO complaint against a subordinate plant employee. (Tr. of MSPB Hearing T88:4–11.) That letter was sent in February 11, 2014, well before the events at issue in this case. (DSOMF ¶¶ 150—51.)

Mr. Hooper, the USPS District Manager who approved the demotion, also testified at the hearing. He explained that he made his decision after reviewing the interviews with all of the witnesses, the supplemental investigation, Ms. Batten's proposal letter, and a letter from an advocate on Ms. Gibbs's behalf. (Tr. of MSPB Hearing 100:20–103:11.) He then explained the reasoning for his decision:

> [W]hen you look at Ms. Gibbs's responsibilities as a supervisor, she failed her responsibilities, you know, to promote or to protect the employees in her unit. As a manager, any time that one of you know, that you have an assault, immediately obviously you should respond to that and the fact that she didn't do that, didn't make any kind of notification to start an investigation. She did pursue the letter carrier for the Civil action, but never took the responsibility on the Postal side to make sure that, you know, this

---

[7] Gibbs asserts that she actually called an EEO office and spoke with an EEO specialist. (PRSOMF ¶¶ 136–44.)

was investigated properly and allowed this particular person that
allegedly assaulted her to potentially stay in the unit and could
have assaulted other people, you know, afterward.

. . . .

I mean we have posters in every facility. The fact that it wasn't
done at all you can make—maybe you can understand at that
particular day at that particular time, but at no point, at no point
in time was this reported to anybody.

(PSOMF ¶ 67 (emphasis added); DSOMF ¶ 132.) Hooper later admitted on cross
examination, however, that Gibbs did in fact report her sexual harassment to
some USPS employees; what she had failed to do, he said, was report to the
"correct people within the Postal Service to start an investigation." (Tr. of
MSPB, 114:16–18.)

Hooper concluded his direct testimony by explaining that he considered
Gibbs's length of service to be an aggravating factor. Because she had been a
supervisor for many years and should have known to report the harassment,
he felt he had no confidence in her ability to continue in management. (Tr. of
MSPB 105:22–107:6.)

Hooper denied on cross examination that Gibbs's pursuit of a private
settlement had factored into his decision to demote her. (*Id.* 108:23–109:1.) He
acknowledged, however, that he stated in his decision that Gibbs had coerced
her subordinate into paying her $10,000. (*Id.* 132:12–17.) Hooper also
acknowledged on cross examination that Nesheiwat and DeGironimo, like
Gibbs, had similar obligations to report the sexual harassment and the
allegedly coercive settlement to the appropriate authorities. (*Id.* 133:7–134:22.)

The MSPB judge then issued a decision denying Gibbs's challenge to her
demotion. (DSOMF ¶ 145.) The judge noted that Gibbs had received
harassment training as a part of her employment at USPS ,which made clear
that she was obligated to report any instances of harassment or sexual
misconduct to the Fort Lee Postmaster, her POOM, her District Manager, her
Human Resources Manager, the OIG, or the Postal Inspection Service. (*Id.* ¶¶
152–54.) The MSPB judge found that Gibbs's report to DeGironimo was not

sufficient, because DeGironimo was not empowered to speak on her behalf to her manager. (*Id.* ¶ 155.)

The MSPB then found that Gibbs's claim that she reported the incident to EEO and Caminero lacked credibility. (*Id.* ¶ 156.) Specifically, the judge found that Gibbs did not contact EEO, noting that there was no evidence that she had called the NAISO hotline. (*Id.* ¶ 148.) The judge acknowledged that it was possible that Gibbs had called the local EEO office, but reasoned that because Gibbs had called the NAISO hotline number seven times before the incident and one time after, she likely would have followed the same procedure if she had reported the Nesheiwat incident. (*Id.* ¶¶ 148–49.) The MSPB judge also questioned why, if Gibbs had been in possession of a letter issued by Kathy Thomas of the EEO stating that she could not bring a claim against a subordinate, she would nevertheless have reported the incident to the EEO. (*Id.* ¶¶ 150—51.)

## I. Other Disciplinary Matters

The USPS never disciplined Nesheiwat. (DSOMF ¶ 169.) USPS claims that it did not do so because too much time had passed since the alleged incident of sexual harassment. Here, it relies on Article 16.1 of the Joint Contract Administration Manual ("JCAM"), which states that "[n]o employee may be disciplined or discharged except for just cause . . . ," (*id.* ¶¶ 170–72; *see also* Reply at 3–4), and a decision by Arbitrator Karen Jacobs in *USPS v. National Association of Letter Carriers, AFL-CIO*, (Oct. 23, 2003), in which the arbitrator determined that USPS violated an employee's rights under Article 16.1. In her decision, Arbitrator Jacobs held that USPS violated "the basic sense of justice on which just cause is based" where it disciplined an employee four to six months after alleged misconduct.

USPS also now notes that none of the witnesses identified (or allegedly identified) by Gibbs corroborated her version of the incident. USPS thus suggests that it would have been difficult to make a case that Nesheiwat had engaged in sexual harassment.

As justification for the severity of the discipline imposed, the USPS cites the case of Keith Reid, a Manager of Human Resources who was not in the same chain of command as Gibbs. (*Id.* ¶¶ 173–74.) Reid was accused of failing to remove pornographic material posted on his Facebook page by his friends quickly enough. (*Id.* ¶ 177.) Like Gibbs, Reid was demoted. (*Id.* ¶ 179.)

## J. Procedural History

As mentioned above, Gibbs brought her claim before the MSPB, which issued its initial decision on July 25, 2018. Gibbs then filed a petition for review with the MSPB on August 29, 2018. (Am. Compl. ¶ 9(d)) After 120 days had elapsed without a decision on the review petition, she filed this action pursuant to 5 U.S.C. § 7702(e)(1)(B). (*Id.* ¶ 9(d–f).)

Gibbs filed the original Complaint in this Court on September 27, 2018. (DE 1.) USPS filed a motion to dismiss (DE 10), and Gibbs filed an Amended Complaint on April 22, 2019 (DE 14). USPS filed a motion for summary judgment on May 20, 2021 (MSJ), Gibbs filed her Opposition on June 30, 2021 (Opp.), and USPS filed a Reply on July 28, 2021 (Reply).

Gibbs brings claims under Title VII of the Civil Rights Act of 1964 for unlawful retaliation and unlawful discrimination.

## II.    STANDARD OF REVIEW

## A. Summary Judgment: Rule 56

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact

16

remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."
*Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III.   DISCUSSION

USPS moves for summary judgment, arguing both that the undisputed facts establish that Gibbs has no claim and that the MSPB decision has issue-preclusive or claim-preclusive effect on this proceeding. I first turn to the logically prior issue of issue and claim preclusion.

### A. Whether the MSPB Decision Has Issue or Claim Preclusive Effect

USPS asserts that the MSPB decision controls this litigation under the doctrines of issue and claim preclusion. Those doctrines have been summarized as follows:

> Issue preclusion, otherwise known as collateral estoppel, bars re-litigation of an issue identical to that in a prior action. Claim preclusion, often called res judicata, is broader in effect and prohibits reexamination not only of matters actually decided in the prior case, but also those that the parties might have, but did not, assert in that action.

*Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 189 (3d Cir. 1993).

Generally, administrative agency decisions made in a judicial capacity may be afforded issue- and claim-preclusive effect. "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata[8] to enforce repose." *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421–22 (1966). The Third Circuit has clarified that an agency is acting in a judicial capacity

---

[8]   Confusingly, the term *res judicata,* which is used as a synonym for claim preclusion, has also been used as a catchall term for preclusion doctrines in general.

when it is "charged with resolving factual and legal disputes based on an evidentiary record developed by the parties following notice and a hearing," as such "functions are inherently judicial in nature, and properly subject to principles of issue preclusion." *Duvall v. Attorney General of the United States*, 436 F.3d 382, 387 (3d Cir. 2006). Preclusion doctrines thus "apply to 'all proceedings that may be deemed adjudicative, no matter whether the governing entity is a court or an agency.'" *Duhaney v. Attorney General of the United States*, 621 F.3d 340, 347–48 (3d Cir. 2010) (quoting *Duvall*, 436 F.3d at 390).

"[C]ommon law preclusion doctrines," however, "apply to adjudicative agency determinations . . . [only] as long as application of these doctrines 'does not frustrate congressional intent or impede the effective functioning of the agency.'" *Id.* (quoting *Duvall*, 436 F.3d at 387–88). Thus, in *Duhaney*, the Third Circuit explained that there is only a "lenient presumption in favor of administrative estoppel" and did not automatically grant estoppel effect to a decision by an immigration judge without first determining that applying preclusion principles would "not frustrate the goals of Congress." *Id.* at 348. Accordingly, "the 'suitability of preclusion may vary according to the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedure' . . . . 'the question is not whether administrative estoppel is wise but whether it is intended by the legislature.'" *Tice v. Bristol-Myers Squibb Co.*, 325 Fed. Appx. 114, 118 (3d Cir. 2009) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108–10 (1991)). As is discussed in further detail below, courts have concluded that it is inconsistent with Title VII to afford administrative agency decisions preclusive effect over discrimination claims which are subsequently brought in federal district court. *Id.* at 119.

For federal employees who seek to vindicate their Title VII rights, the relevant administrative scheme operates as follows: The employee who claims she was the victim of discrimination is first subject to the administrative scheme set forth in the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111. *See Slingland v. Donahoe*, 542 Fed. Appx. 189, 192 (3d Cir.

2013). She may proceed down either of two paths: she may file a complaint with the employer's EEO office, or she may file an appeal with the MSPB, although she cannot do both. *Id.* If she files an appeal with the MSPB, she may not file a discrimination action in federal district court until after the MSPB has rendered its final decision. *Id.*; *see also* 5 C.F.R. § 1201.157; 29 C.F.R. 1614.310(b). If the employee attempts to file suit in federal district court before completing either step, her claim can be dismissed for lack of exhaustion of administrative remedies. *Slingland*, 542 Fed. Appx. at 192.

After the MSPB has issued a ruling, an employee may seek judicial review of the decision. 5 U.S.C. § 7703. Section 7703 offers two avenues for review. First, Section 7703(b)(1) provides that petitions for review should generally be filed in the Federal Circuit. Section 7703(b)(2), however, provides an exception to (b)(1) for "[c]ases of discrimination subject to the provisions of section 7702 of this title."[9] Those cases "'shall be filed under' section 717(c) of the Civil Rights Act, section 15(c) of the Age Discrimination in Employment Act of 1967, and section 16(b) of the Fair Labor Standards Act of 1938." *Id.* (citations omitted).

The United States Supreme Court has determined that cases brought under § 7703(b)(2) are properly filed in federal district court, rather than the Federal Circuit. *Kloeckner v. Solis*, 568 U.S. 41, 49 (2012). The *Kloeckner* Court reasoned that the enumerated discrimination statutes in (b)(2) each authorize suit in federal district court, so that is the proper place for a litigant to seek review of an MSPB decision under the same statutes. *Id.* at 50. Mixed cases involving both an individual's rights under the Civil Service Act and discrimination claims are to be brought in federal district court. *Id.*

Section 7703(c) sets the standard of review for federal court review of MSPB decisions. The Federal Circuit, when reviewing a decision in its capacity under § 7703(b)(1), is directed to review MSPB decisions under an arbitrary-

---

[9] Section 7702 covers claims based on discrimination arising under Title VII. 5 U.S.C. § 7702.

and-capricious standard. *Id.* § 7703(c)(1–3). Federal district courts reviewing MSPB decisions pursuant to Section 7703(b)(2), however, are not to afford similar deference: "[I]n the case of discrimination brought under any section [] referred to in subsection (b)(2) of this section, the employee or applicant shall have the right to have the facts subject to <u>trial de novo</u> by the reviewing court." *Id.* § 7703(c) (emphasis added).

There is an obvious tension between the de novo review granted by the statute and the USPS's proposal here to afford the MSPB decision preclusive effect. It comes as no surprise, then, that the courts, including the United States Supreme Court, have rejected the application of preclusion doctrines in such cases, reasoning that "according preclusive effect to underlying agency decisions would eviscerate the ultimate responsibility that Congress placed with the judiciary by depriving aggrieved parties of a federal forum." *Tice*, 325 F. App'x at 120; *see also Chandler v. Roudebush*, 425 U.S. 840 (1976) (""Congress intended to accord federal employees the same right to a trial *de novo* [following administrative proceedings] as is enjoyed by private-sector employees . . . under the amended Civil Rights Act of 1964"); *University of Tennessee v. Elliot*, 478 U.S. 788, 795 (1986) ("It would be contrary to the rationale of *Chandler* to apply res judicata to deny a respondent a trial *de novo* on his Title VII claim . . . . Congress did not intended . . . administrative proceedings to have preclusive effect on Title VII claims.")); *Gergick v. Austin*, 997 F.2d 1237, 1238 (8th Cir. 1993) ("Congress intended that claims arising under Title VII be afforded a trial *de* novo. Consequently, the doctrine of administrative estoppel is inapplicable to Title VII claims.") (citations to *Chandler* and *Elliot* omitted); *Rosenfeld v. Department of the Army*, 769 F.2d 237, 239–42 (4th Cir. 1982) (denying collateral estoppel effect of administrative findings on age discrimination claim); *Anderson v. Napolitano*, 2010 U.S. Dist. LEXIS 10422 at *23–24 (S.D. Fla. Feb. 8, 2010) ("Title VII claims are entitled to *de novo* review. Consequently, unreviewed administrative proceedings do not have preclusive effect on Title VII claims."); *Burrell v. United States Postal Serv.*,

164 F. Supp. 2d 805, 811 (E.D. La. 2001) (plaintiff "would have been entitled to pursue her Title VII claims in this Court after an adverse finding on the merits by the MSPB without any res judicata or collateral estoppel effects"); *Long v. Frank,* 808 F. Supp. 961, 964 (E.D.N.Y. 1992) ("Administrative proceedings in ADEA actions, just as in Title VII actions, do not enjoy preclusive effect.").

The Third Circuit's decision in *Tice v. Bristol-Myers Squibb Co.* is not to the contrary. 325 F. App'x 114. There, the plaintiff had previously filed an administrative claim with the Occupational Safety and Health Administration ("OSHA"). Before the administrative law judge, the plaintiff had argued that she was fired for reporting illegal corporate activity in violation of Sarbanes-Oxley. *Id.* at 115–16. The OSHA ALJ rejected that claim, finding that the employer had not fired her for reporting illegal corporate activity, but rather for the legitimate, non-pretextual reason that she had been falsifying reports. *Id.*

The *Tice* plaintiff then brought a claim under Title VII in federal district court, arguing she was fired because of her age and gender. *Id.* at 116. The Third Circuit found, however, that the OSHA ALJ's decision had issue preclusive effect on the subject of pretext. It explained that Sarbanes-Oxley statutorily prohibited collateral attacks on final agency decisions issued under the act. Specifically, it states "[a]n order . . . with respect to which review could have been obtained under subparagraph (A) [providing for judicial review of a final agency decision] shall not be subject to judicial review in any criminal or other civil proceeding." 49 U.S.C. § 42121(b)(4)(B). The Third Circuit thus concluded that "normal preclusion principles apply here because [Sarbanes-Oxley] falls outside the general Title VII framework and *explicitly prohibits collateral attacks.*" 325 Fed. App'x at 123. It reasoned that permitting collateral estoppel in the narrow space of proceedings under Sarbanes-Oxley "comports with the plain language of SOX as well as the general purpose of Title VII," namely Sarbanes-Oxley's "explicit prohibition against collateral attack" and Title VII's aim of providing a federal forum for complaints of discrimination on the basis of protected characteristics. *Id.* at 120. In short, *Tice* is simply off

22

point. Ms. Gibbs's case, unlike *Tice,* does not involve Sarbanes-Oxley's bar on collateral attacks; it falls squarely within the ordinary run of cases in which a Title VII claim was raised and rejected in prior administrative proceedings.

I therefore rule that application of claim and issue preclusion is not appropriate. Unencumbered by those prior findings of fact, I turn to the summary judgment issue, *i.e.,* whether the undisputed facts here entitle USPS to judgment as a matter of law.

### B. Title VII Framework

The retaliation and gender discrimination claims which Gibbs asserts are governed by the burden-shifting analysis set forth in the Supreme Court's decision in *McConnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff "must first establish a prima facie case" that she suffered retaliation and discrimination. *See Moore v. Johnson*, 2016 WL 7408844 at *4 (D.N.J. 2016) (quoting *Thompson v. Bridgeton Bd. of Educ.*, 9 F. Supp. 3d 446, 454 (D.N.J. 2014)). Second, if the plaintiff establishes a prima facie case, "the burden then shifts to the employer to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its actions." *Id.* (citing *Tourtellote v. Eli Lilly & Co.*, 636 Fed. Appx. 831, 842 (3d Cir. 2016)). Third, if the employer is able to articulate such a reason, "the burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation." *Id.* At this point, to overcome a motion for summary judgment, a plaintiff must

> point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Id.* (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)).

### 1. Gibbs's Retaliation Claim – Prima Facie Case

As relevant here, Title VII confers a cause of action based on an employer's retaliation for protected activity, as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participate in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3.

To establish a prima facie case of retaliation, a plaintiff must make a tripartite showing:

(1) That she engaged in protected employee activity; (2) that there was an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) that there is a causal connection between the employee's protected activity and the employer's adverse action.

*See Moore*, 2016 WL 740844 at *6 (citing *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

<u>Whether Gibbs Engaged in Protected Activity</u>

Gibbs asserts that she engaged in a variety of protected activities. She specifically identifies three: (1) reporting the sexual harassment to the EEO office, to Caminero, and to DeGironimo in 2014; (2) providing information to USPS OIG investigators in September 2016 and January 2017; and (3) threatening to sue and settling with Nesheiwat in 2014. (Opp. at 7–8.) Reporting sexual harassment to an EEO office or providing information to investigators is unambiguously protected activity under the statute and the parties do not dispute that aspect of Gibbs's claim. They do, however, dispute whether Gibbs's threatened civil claim against Nesheiwat constitutes a protected activity.

"Title VII's anti-retaliation provisions protect employees who participate in Title VII's statutory processes or who <u>otherwise oppose</u> employment practices made illegal by Title VII." *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 134–35 (3d Cir. 2006) (emphasis added). Gibbs asserts that her threatened civil suit against Nesheiwat constitutes "opposition" under the statute.

"In Title VII, 'oppose,' being left undefined by the statute, carries its ordinary meaning: to resist or antagonize . . .; to contend against; to confront; resist; withstand.'" *Crawford v. Metro. Gov't of Nashville & Davidson County*, 555 U.S. 271, 276 (2009). "[P]rotected opposition includes more than formal filing of charges before the EEOC," and "there is no hard and fast rule as to whether the conduct in a given case is protected. Instead . . . [the courts] evaluate the facts of each case in light of the statutory language and legislative intent." *Curay-Cramer*, 450 F.3d at 135. Thus "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support for co-workers who have filed formal charges" constitute "opposition" under the statute. *Id.*

"A general complaint of unfair treatment," however, "is insufficient to establish protected activity under Title VII." *Id.* The complaint must be "specific enough to notify management of the particular type of discrimination at issue in order to constitute protected activity." *Sanchez v. SunGard Availability Servs., L.P.*, 362 Fed. App'x 283, 288 (3d Cir. 2010). "[O]pposition to an illegal employment practice must identify the employer and the practice—if not specifically, at least by context," *Gress v. Temple Univ. Health Sys.*, 784 Fed. App'x 100, 106 (3d Cir. 2019), and contain "some perceptible connection to the employer's alleged illegal employment practice," *Curay-Cramer*, 450 F.3d at 135. It "must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice." *Id.* Additionally, courts "look to the message being conveyed rather than the means of conveyance." *Sanchez*, 362 Fed. App'x at 288.

This case does not fit neatly into the typical "opposition" case, where a plaintiff has complained to management about discrimination or a discriminatory practice and is punished as a result. *See, e.g.*, *See Bliss v. MXK Restaurant Corp.*, 220 F. Supp. 3d 419, 425–26 (S.D.N.Y. 2016) (the usual case

involves "some act of complaining or protesting."). I nevertheless conclude that filing a civil case against one's harasser on the basis of sexual harassment, or threatening to do so and then settling with the alleged harasser, may fit the definition of protected "opposition" under Title VII.

Taking the words at their plain meaning, pursuing a civil claim against one's harasser for their harassing conduct is clearly "resisting," "confronting," or "contending against" sexual harassment. *Crawford*, 555 U.S. at 276. Such an interpretation is consistent with the legislative intent behind the anti-retaliation provision in Title VII, which was aimed at prohibiting employers from punishing employees for resisting sex discrimination. *Curay-Cramer*, 450 F.3d at 135. To hold otherwise might discourage employees from standing their ground against harassment by fellow employees.

*Curay-Cramer* makes it clear that no hard-and-fast rules apply and that each case must be analyzed on its own merits. 450 F.3d at 135. Cases have held that protected opposition may take the form of pursuing criminal charges against an alleged harasser. *See DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999); *see also Patrick v. Local Union No. 282, Int'l Brotherhood of Teamsters, AFL-CIO*, 2005 WL 2179415 at *4 (E.D.N.Y. 2005). Likewise, there is protection against retaliation for negotiating and securing a settlement against one's employer for sex discrimination. *See Greenlee v. Southwest Health Sys.*, 2007 WL 2320544 at *10 (D. Colo. Aug. 9, 2007) ("If alleging discrimination constitutes protected opposition, then negotiating and securing a settlement that resolves such allegations must also constitute protected opposition."); *see also Wells v. Colo. DOT*, 325 F.3d 1205, 1212 (10th Cir. 2003) (accepting that bringing suit to enforce a settlement of a prior Title VII claim is protected activity).

Research has not, however, revealed a previous retaliation case in which the alleged protected activity was the threat of a sexual harassment suit, or pursuit of a private settlement, by a manager against an employee.

Gibbs's threat of a lawsuit and negotiation of a $10,000 settlement differ in a number of ways from the typical opposition case. First, Gibbs did not bring her prospective suit against Nesheiwat to USPS's attention, or in any way make an effort to make her protest against her treatment known. Indeed, it appears that she regarded the matter as "private" and would have preferred that the employer never find out. Nevertheless, courts do not require that opposition be expressed to the employer. *See Curay-Cramer*, 450 F.3d at 136 ("public manifestations of disagreement with illegal employment practices can be protected under the opposition clause"); *see also id.* at 135–36 (compiling cases in which employees engaged in public protest or appeared in television programs to complain about conduct). Indeed, in *Curay-Cramer*, the employee signed her name to an advertisement in favor of *Roe v. Wade* and her employer learned separately that she had done so. *Id.* at 135. While the Third Circuit ultimately concluded that the employee's conduct was not protected activity, it did not hold against the plaintiff the fact that her opposition was directed to the public at large rather than to her employer. *Id.*; *see also Barber v. CSX Distribution Services*, 68 F.3d 694, 702 (3d Cir. 1995) (opposition includes "writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges") (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). Gibbs says she expressed her opposition to Nesheiwat and others, and the authorities at USPS eventually learned about it when they conducted their investigation.

Second, Gibbs did not actually file a formal complaint or lawsuit, but only threatened to do so. *See Bliss v. MXK Restaurant Corp.*, 220 F. Supp. 3d 419, 425–26 (S.D.N.Y. 2016) ("the extent of her opposition was that she 'expressed to the employee her belief that Kotsonis was racist and that the employee should pursue a claim based on that fact. This is a far cry from even the 'informal' protests outlined by the *Sumner* Court, which at the very least involved some act of complaining or protesting."). The Third Circuit has been

27

clear, however, that it looks "to the message being conveyed rather than the means of conveyance." *Sanchez*, 362 Fed. App'x at 288. The message Gibbs expressed was that she opposed her alleged sexual harassment and believed it violated the law.

Third, as for the message Gibbs conveyed, Gibbs did not specifically invoke Title VII; to the extent she gave any legal form to her claims, she identified them as being based in harassment or battery. (Am. Compl. ¶ 17.) Nevertheless, "nothing in the language of the statute or common sense suggests that [a plaintiff is] required to mention Title VII in order to be protected from opposing the practices that Title VII renders unlawful." *Rodriguez-Vives v. P.R. Firefighters Corps. of P.R.*, 743 F.3d 278, 283–84 (1st Cir. 2014) (anti-retaliation provision protects filing lawsuit for discrimination under § 1983 and the equal protection clause). In *Rodriguez-Vives*, the defendant conceded that the plaintiff's previous suit "alleged discriminatory hiring practices and procedures on the basis of gender," and because "Title VII makes it unlawful 'for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's . . . sex . . . . The conduct Rodriguez-Vives opposed was therefore precisely the kind of discrimination that Title VII was intended to combat." *Id.* at 284. Here, Gibbs's potential suit against Nesheiwat targeted sex discrimination in the workplace the form of groping. That is "an unlawful employment practice" prohibited by Title VII,[10] so "[t]he opposition for which she was punished therefore fell well within the scope of the conduct that Congress sought to protect from retaliation, whether or not she referred to Title VII . . . in voicing that opposition." *Id.*

---

[10]     Indeed, it is not even necessary that Nesheiwat's conduct actually be found to have constituted a Title VII violation. Gibbs need only have "complained about the type of conduct that is generally protected by that Title, such as discrimination" as long as the discrimination could "remotely be considered 'extremely serious'" such that "a reasonable person would have believed that [it] violated Title VII's standard." *Kengerski v. Harper*, ___ F.4th ___, 2021, WL 3199225, 2021 U.S. App. LEXIS 22494 at *9 (3d Cir. July 29, 2021). Groping in the workplace is certainly serious conduct and constitutes discriminatory treatment which a reasonable person could conclude violates Title VII.

Fourth, the Third Circuit requires that opposition "identify the employer and the practice." *Curay-Cramer*, 450 F.3d at 135. I find Gibbs's threatened civil suit implicitly met that requirement because it identified Nesheiwat's alleged groping in a USPS work location.

Fifth, it may be objected that Gibbs chose wrongful means of opposing sexual harassment. On one version of the facts, she oppressed or even extorted a subordinate employee, and failed in her duty as a manager to report sexual harassment. Here, however, I must credit Gibbs's version of the facts, and the issue is the threshold one of what constitutes protected "opposition" to harassment. That definition is necessarily broad.[11]

USPS claims that Gibbs engaged in what amounted to a shakedown, not a protest. A fact finder might be persuaded to agree. But USPS is the summary judgment movant here. Crediting Gibbs's version of the events, as I must,[12] I conclude that there is at least an issue of fact as to whether Gibbs engaged in protected opposition to sexual harassment.

<u>Whether USPS Took an Adverse Employment Action Against Gibbs</u>

"For an employer's action to satisfy the second prong of a prima facie case of retaliation, the plaintiff 'must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Daniels v. School Dist. of Phil.*, 776 F.3d 181, 195 (3d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The parties do not dispute that adverse action was taken against Gibbs: namely, that USPS put her on administrative leave in November

---

[11]    Opposition may be wrongful for some independent reason. It might, for example, take unacceptable physical form, or, as is alleged here, violate other workplace regulations and norms. In such a case, the employer might well succeed on the second or third prong of *McDonnell-Douglas* by demonstrating that the allegedly retaliatory demotion was independently justified by a non-discriminatory, non-pretextual reason. But that is a separate issue. *See* pp. 31–42, *infra*.

[12]    As previously noted, I construe all disputed facts in Gibbs's favor on this motion for summary judgment. *Boyle*, 139 F.3d at 393.

2016, that Batten proposed her demotion in July 2017, and that Hooper demoted her as of January 2018. (Opp. at 8.) These are clearly actions which, if retaliatory, would be sufficient to dissuade a reasonable worker from making a charge of discrimination.

<u>Whether There Was a Causal Connection Between the Adverse Action and the Protected Activity</u>

As previously noted, Gibbs took three protected actions which she claims were causally related to her demotion: her report to the EEOC, her cooperation with USPS OIG investigators, and her threat of bringing a civil suit against Nesheiwat. To complete her prima facie case, Gibbs must show that there was a causal connection between her protected actions and her demotion.

Courts "consider 'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment." *Daniels*, 776 F.3d at 196 (quoting *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). A plaintiff may establish a causal connection between protected activity and the employer's adverse action by "(1) unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing." *Kania v. Potter*, 358 Fed App'x 338, 344 (3d Cir. 2009) (quoting *Lauren W. ex rel Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). "In the absence of . . . a close temporal proximity" courts "consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196 (quoting *LeBoon*, 503 F.3d at 232–33).

First, there is ample evidence of a causal relationship between Gibbs's threatened civil suit against Nesheiwat and her demotion. Indeed, USPS explicitly states that the civil suit was a basis for her demotion in its motion for summary judgment. (MSJ at 6 ("Gibbs failed to follow established procedures

30

for reporting sexual harassment and instead pressured a subordinate into paying her $10,000 to 'resolve' the incident.")) USPS's concession of the point is sound, as both Batten and Hooper, in their letters demoting Gibbs, explicitly cited her threatened suit against Nesheiwat. (*See* Batten Letter at 2; Hooper Letter at 2.) While Hooper later claimed in his testimony before the MSPB that he had not relied on Gibbs's suit to demote her (MSPB Tr. 108:23–109:1), there is at least a disputed issue here.

As for Gibbs's report to the EEO, Caminero, and DeGironimo, and her cooperation with USPS OIG investigators, I also find sufficient evidence to make out a prima facie case of causation. As Gibbs notes, USPS placed her on administrative leave shortly after it learned that she had cooperated with investigators and after she told them that she reported the harassment. Such a short interval between events—here, about a week—is suggestive of causation. *See Moore*, 2016 WL 7408844 at *7; *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) ("The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.") (quoting *Burrus v. United Tele. Co.*, 683 F.2d 339, 343 (10th Cir. 1982)).[13] "[T]he burden of establishing a *prima facie* case . . . is not onerous." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Gibbs has made out a prima facie case.

## 2. USPS Has Asserted a Legitimate, Non-Discriminatory Reason for Gibbs's Demotion

Because Gibbs has made out a prima facie case of retaliation, USPS must "rebut the proof of discrimination by articulating some legitimate, nondiscriminatory reason for the employee's discharge." *Jalil*, 873 F.3d at 706.

USPS claims that Gibbs was demoted because its investigation indicated that she failed to notify the proper authorities in order to start an investigation

---

[13] USPS argues that it took action a week after the investigation terminated because the investigation revealed that Gibbs had engaged in misconduct. (Reply at 13.) That may be so, but a factfinder is entitled to credit or reject USPS's explanation.

into the sexual harassment, thereby potentially exposing other individuals in the Fort Lee post office to ongoing sexual harassment. (MSJ at 7.) It also claims that it demoted Gibbs because it determined that she "forced a subordinate to enter into a secret agreement that net[ted] her $10,000." (*Id.*) These claims are supported by Batten and Hooper's contemporaneous decision letters, which stated that they demoted Gibbs because they could no longer trust her in a managerial position in light of the fact that she had not reported the harassment, thus endangering other postal employees, and because she abused her superior position at the company to take advantage of Nesheiwat. (Batten Letter at 2; Hooper Letter at 2.)

Each of these would constitute a legitimate, nondiscriminatory reason for demoting Gibbs. *Jalil*, 873 F.2d at 708. Even if a threat to sue is protected activity, Gibbs was not thereby entitled to abuse her superior rank or otherwise intimidate Nesheiwat into a secret monetary settlement. On USPS's version of the facts, Gibbs was not merely invoking the legal system to vindicate her rights, but engaging in an extortionate "shakedown" of her subordinate employee. (*See e.g.* DSOMF ¶¶ 27–29.) On that version of events, USPS had ample nondiscriminatory reasons to demote Gibbs. Gibbs, however, claims that these reasons were not the actual reasons for her demotion.

### 3. Gibbs's Proof That the Non-Discriminatory Reason is a Pretext

The burden shifts to Gibbs to demonstrate that the stated non-discriminatory reasons for her demotion were pretextual. She claims that the real reason for her demotion was not failure to report sexual harassment or abuse of her managerial position. On the contrary, she says, she was demoted because she *did* report the sexual harassment and did no more than assert her legitimate rights against Nesheiwat.

In a Title VII case, "[t]he ultimate burden of persuasion . . . always remains with the plaintiff," who, when faced with a legitimate nondiscriminatory reason for her firing, must prove "by a preponderance of the evidence that the alleged reasons proffered by the defendant were pretextual

32

and that the defendant intentionally [retaliated] against the plaintiff." *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–63 (1981)). The plaintiff may satisfy that burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Burdine*, 450 U.S. at 256).

At trial, "[i]t is not enough . . . to *dis*believe the employer; the fact-finder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993). At summary judgment, however, "the plaintiff's burden is not so heavy. To survive summary judgment, the plaintiff need only raise doubt as to the legitimacy of the defendant's proffered reason for its adverse action; it need not prove its discrimination case." *Andes v. N.J. City. Univ.*, 419 F. App'x 230, 233 (3d Cir. 2011). "'[A]ffirmative' evidence [of discrimination] is not required at summary judgment." *Andes*, 419 Fed. App'x at 233 (citing *Fasold v. Justice*, 409 F.3d 178, 187 (3d Cir. 2005)). "[A]t this stage, the 'real' reason for the employer's action is unimportant; it matters only that there is evidence to suggest that there *is* a 'real' reason which is not the articulated reason." *Id.*

Gibbs thus may defeat summary judgment by adducing evidence from which a fact finder could reasonably infer that the employer's non-discriminatory reasons were either a post hoc fabrication or otherwise did not actually motivate the employment action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Such a showing may rest on "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its actions so that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 765.

The issue, however, is not whether the demotion was fair or justified. Gibbs cannot carry her burden under Title VII by showing that "the decision to [demote her] was wrong or mistaken. Inaccuracy does not establish pretext.

The issue is not whether the USPS's decision was unwise or even correct . . . ." *Wilcher v. Postmaster Gen.*, 441 Fed. App'x 879, 881 (3d Cir. 2011).

In the following discussion, I find enough such inconsistencies or weaknesses in the record to defeat summary judgment. That is not to say that Gibbs can ultimately prove that that USPS punished Gibbs for discriminatory reasons other than its proffered explanations. It is only to say that her evidence is sufficient to warrant a trial of that issue.

### i.    USPS's Claim That it Demoted Gibbs Because She Failed to Report Her Harassment

First, I consider USPS's explanation that it demoted Gibbs because she failed to properly report her harassment by Nesheiwat. There is a great deal of evidence that suggests this was USPS's reason for firing Gibbs: both Batten and Hooper cited this reason in their demotion letters, and Hooper repeated it during his testimony in front of the MSPB. Still, on the difficult-to-prove issue of intent, the Title VII case law grants a plaintiff some breathing space at the summary judgment stage. There is sufficient evidence to raise a triable doubt that this was USPS's actual reason for demoting Gibbs.

USPS's Explanation Evolved Over Time

First, USPS's precise explanation as to how Gibbs failed to comply with reporting standards has evolved over time. Batten and Hooper both initially faulted Gibbs for failing to report her alleged harassment to anyone at all. (*See* Batten Letter (DE 48-4) at 2 ("to this day you never reported what you had perceived and have characterized as the actions of the perpetrator of sexual assault so that it could be promptly and fully investigated"); Hooper Letter (DE 48-8) at 2 ("it is undisputed that you <u>perceived</u> a currently employed postal service employee as a sexual predator. Yet, you never reported what you perceived as a sexual assault so that it could be fully investigated promptly") (emphasis in original).) Both managers said that Gibbs should have reported the incident to the local Postmaster, POOM, District Manager, Human Resources manager, Labor Relations manager, the Office of the Inspector

General, or the Postal Inspection Service. (*See* Batten Letter (DE 48-4) at 2; Hooper Letter (DE 48-8) at 2.)

On cross examination during the MSPB hearing, Hooper clarified that he demoted Gibbs not because she failed to report her alleged harassment at all, but because she didn't report it in the proper manner or to the right people. (Tr. of MSPB Hearing (DE 48-16) at 114:16–18 ("she didn't properly notify the correct people within the Postal Service to start an investigation").) On further questioning, he backtracked a bit farther. Admitting that Gibbs might have properly reported her harassment to Caminero, he then claimed for the first time that Gibbs was required to report the harassment via written documentation. (*Id.* 115:24–116:2; 117:3–10.)

To be sure, such inconsistencies might have arisen innocently. It could have been Hooper's state of knowledge, rather than Hooper's story, that evolved over time, or he simply could have been mistaken. On the other hand, however, such inconsistencies could be cited as evidence of pretext.

<u>USPS Sets a Less Rigid Standard</u>

As stated above, Batten and Hooper claimed that Gibbs was required to report harassment to her local Postmaster, POOM, District Manager, Human Resources manager, Labor Relations manager, the Office of the Inspector General, or the Postal Inspection Service. In support of that requirement, they cited Publication 552, *Manager's Guide to Understanding, Investigating, and Preventing Harassment*. (Ex. C to Reply (DE 59-4).) Publication 552, however, does not limit "proper" reporting to those listed persons or entities. One section states that "[i]n all cases of harassment, employees should also report the incident to one of the following: Their immediate supervisor or manager [or] . . . Another supervisor or manager." (*Id.* at 12.) Another section requires that managers "[c]onduct harassment inquiries promptly and, where necessary, take inquiries to the next appropriate level" and "[c]onfer with and inform the Manager, Human Resources, in your local district or area office . . . of any harassment allegations." (DE 59-4 at 14.)

Again, Batten and Hooper could simply have had an understanding of Publication 552's requirements that was somewhat erroneous, though in the ballpark. On the other hand, their insistence that Publication 552 required Gibbs to report in a particular manner to a particular list of authorities could be taken as evidence of pretext.

Gibbs's Evidence of Substantial Compliance

On this record, it remains debatable that Gibbs actually did fail to comply with USPS reporting requirements. USPS employs a number of resources to inform employees and managers what to do in the event of a sexual harassment.

One such resource is Poster 159, which is posted in every USPS building. (PSOMF ¶ 15.) The Poster is entitled WORKPLACE HARASSMENT, KNOW YOUR RIGHTS! TAKE RESPONSIBILITY! It enumerates activities which constitute harassing conduct, which it defines as "unwelcome verbal or physical conduct that demeans or shows hostility or aversion toward an individual or group of individuals." (DE 53-12.) It specifically identifies "physical contact of a sexual nature that is unwelcome to the recipient." (*Id.*) It then tells a victim of harassment what to do:

> Postal Employees who believe they are the victims of workplace harassment or inappropriate conduct, or who have witnessed such harassment, should bring the situation to the attention of any one of the following:
>
> - Their immediate supervisor or manager.
> - Any supervisor or manager.
> - The manager, Human Resources.
> - A union representative or coworker who will speak to a manager on the employee's behalf.
> - A special agent of the Office of Inspector General.

(*Id.*) It goes on to state that managers have a responsibility to act in response to such complaints:

> Any manager or supervisor who receives a complaint must act to stop any inappropriate behavior, ensure that a prompt and thorough investigation is conducted, and ensure that the harassing or inappropriate conduct does not persist . . . . All

> managers and supervisors must follow the Management Inquiry
> Process materials available in Publication 552, *Manager's Guide to
> Understanding, Investigating, and Preventing Harassment*, when a
> complaint is brought to their attention.

(*Id.*) Finally, Poster 159 states that "[i]n addition, you can seek relief through:
The EEO complaint process," among other options. (*Id.*) It states that "[i]f you
elect to pursue an EEO complaint, you must contact the EEO Centralized
Intake Center by calling toll free: 1-888-EEO-USPS (888-336-8777) . . . within
45 days of the act or acts giving rise to the claim to preserve your rights under
federal law." *Id.*

Gibbs claims that she reported the harassment incident in compliance
with Poster 159. The poster directs that an employee facing sexual harassment
should report it to "any supervisor," a category that seemingly would include
Caminero; if not Gibbs's supervisor, he was of (acting) supervisory rank.[14]
(MSPB Tr. at 117:8–10.) She also claims to have followed the EEO[15] process,
listed on Poster 159 as an option "in addition" to the other reporting avenues.[16]

The USPS also provides another resource for employees and managers
called Publication 553, "Employee's Guide to Understanding, Preventing and
Reporting Harassment." Under the section entitled "What to Do if You Are
Harassed," the Publication describes various means of reporting:

> Whether or not you get the harasser to stop, report harassing
> behavior to those in authority who are responsible for stopping the

---

[14] Gibbs claims that she complied with the Poster by telling DeGironimo as well,
but DeGironimo was not her union representative and so could not speak to a
manager on her behalf.

[15] USPS has proffered evidence, such as call records, to call into doubt Gibbs's
claim that she contacted EEO. Gibbs testified that she contacted a local EEO office,
which would not be reflected in the NAISO hotline call records. A jury might accept
USPS's conclusion that Gibbs did not contact EEO, or it might accept her testimony
that she did.

[16] This, of course, is a poster, not a carefully drafted statute or set of
regulations. It is somewhat ambiguous whether the "in addition" language means that
these are alternative avenues for reporting, or whether they are supplemental actions
which may be taken in addition to the obligatory methods of reporting.

harassment, and who will make a record of it. You can write, or just talk, to any of the following:

- Your immediate supervisor or manager.
- Any supervisor or manager.
- The manager of Human Resources.
- A Special Agent of the Office of the Inspector General.
- A Postal Service Inspector, when you believe that criminal misconduct is involved.

If you are uncomfortable making a report yourself, you can ask a union representative or coworker to speak to a manager on your behalf.

(DE 53-13 at 137.) Publication 553 states that employees "also have the right to pursue a complaint through the EEO process." (*Id.* at 138.) For the reasons expressed in relation to Poster 159, it appears Gibbs has submitted evidence of compliance with these processes.

Finally, USPS provides direction to managers in the form of Publication 552, "Manager's Guide to Understanding, Investigating and Preventing Harassment." (DE 59-4.) Managers faced with complaints of sexual harassment are directed to confer with the Manager of Human Resources and institute an Initial Management Inquiry Process ("IMIP") if warranted. (DE 59-4 at 1.) Publication 552 then directs managers to interview the parties, gather detailed data, and seek written statements, among other things. (*Id.*) Managers are then to evaluate the statements, consult with the Human Resources Manager regarding remedies or discipline, and then carry out the discipline. (*Id.*) The publication makes clear that it is a supervisor's "role to listen, inquire, and try to resolve a harassment complaint. If you do not have the authority to conduct an inquiry, you must take it to a manager, postmaster, or supervisor who does." (*Id.* at 13.)

Gibbs does not dispute that she failed to comply with Publication 552. It is undisputed that she did not institute an IMIP, conduct an investigation, or even inform the Manager of Human Resources. It is not obvious, however, that the cited portions of Publication 552 applied to Gibbs under these

38

circumstances. Poster 159 directs "[a]ny manager or supervisor who receives a complaint" to "follow the Management Inquiry Process materials available in Publication 552." Gibbs, for sure, was of managerial rank. She did not, however, "*receive* a complaint"; in this scenario, she would be the complainant. A plausible reading of Publication 552 is that it refers to managers *qua* managers, not victims of sexual harassment who happen to be managers.

Publication 552 may be read to incorporate an assumption that the usual victim of harassment is an ordinary employee. But Gibbs, Hooper testified, was a manager, and he held her to a higher obligation to comply with the directions for managers. (MSPB Decision (DE 48-17) at 8; MSPB Tr. at 149:18–151:11.) A factfinder could find that Hooper stated a sincere, good faith interpretation of these materials; on the other hand, it could find that this interpretation was unjustified and bespeaks some pretextual motive to disregard Gibbs's compliance with the usual reporting requirement.

Whether Any Noncompliance Was Severe

Assuming *arguendo* that Gibbs was in technical noncompliance with Publication 552, the parties dispute whether such noncompliance was sufficient to merit demotion. *See Jalil*, 873 F.2d at 709 (noting that while Jalil could legitimately have been fired for insubordination, summary judgment was inappropriate because of "the very real possibility that Avdel 'seized upon this instance of insubordination to fire' Jalil"). On Gibbs's version of events, she told Caminero, DeGironimo, and the EEO about her harassment. If this did not follow reporting requirements to the letter, it at least constituted an effort to tell individuals in authority within USPS about her harassment. In other words, she was in substantial, if not technical, compliance with reporting requirements.

USPS sought to justify its treatment of Gibbs's noncompliance as a serious offense by explaining that Gibbs's silence left coworkers exposed to someone she regarded as a sexual predator. (Batten Letter (DE 48-4) at 2.) In response, Gibbs points to an inconsistency. She states that she reported the harassment to DeGironimo. As a manager, DeGironimo would have had the

same reporting and investigatory obligations under Poster 159 and Publication 552 that formed the basis for Gibbs's demotion. The evidence does not reflect that DeGironimo followed those procedures, or that he faced any disciplinary consequences for failing to do so. Again, a factfinder could take this as evidence that USPS's claim that it punished Gibbs for similar misconduct was pretextual.

USPS's Explanations for Never Disciplining Nesheiwat

Nesheiwat admitted to having inappropriately touched Gibbs in the connection with the settlement (although he denied it in testimony), and he never reported the alleged extortion to a supervisor. Accepting Gibbs's version of the facts (*i.e.,* that the harassment did in fact take place and that she reported it), the failure to discipline Nesheiwat could be taken as further evidence that the basis for her demotion was pretextual.

USPS at one point claimed that JCAM Article 16.10 barred punishment of Nesheiwat. (MSJ at 12.) That provision provides as follows:

> The records of a disciplinary action against an employee shall not be considered in any subsequent disciplinary action if there has been no disciplinary action initiated against the employee for a period of two years.

> Upon the employee's written request, any disciplinary notice or decision letter will be removed from the employee's official personnel folder after two years if there has been no disciplinary action initiated against the employee in that two-year period.

(*Id.*) USPS now admits, however, that Article 16.10 is irrelevant. (Reply at 3 n.2.)

Now, USPS relies on Article 16.1, which states that "[n]o employee may be disciplined or discharged except for just cause." (Reply at 4.) This provision seems to articulate no more than a generalized standard. But USPS cites an interpretation of Article 16.1 in *USPS v. National Association of Letter Carriers, AFL-CIO* (Oct. 23, 2003) (DE 59-3), where an arbitrator found that a delay of four to six months between the alleged misconduct and a disciplinary investigation was unjustifiably long.

40

Again, a fact finder could go either way. It could find that USPS was sincerely concerned with the timeliness of a complaint against Nesheiwat, based on the persuasive force of this arbitration decision. On the other hand, this arbitration decision could easily be distinguished, and USPS's reliance on it could be portrayed as pretextual.[17]

### ii.   USPS Claims That it Fired Gibbs for Extorting Nesheiwat

Second, USPS asserts it fired Gibbs for extorting Nesheiwat. Gibbs has shown evidence that USPS has at least wavered on that point, raising enough doubt to require a trial on the issue of pretext.

Batten and Hooper initially appeared to fault Gibbs for having threatened to sue Nesheiwat unless he paid her. (*See* Batten Letter (DE 48-4) at 3 ("your threat to sue your subordinate Letter Carrier Nesheiwat which resulted in a $10,000 payment to you make[s] you unfit to continue to serve in a position of management"); Hooper Letter (DE 48-8 at 2–3 ("You threatened [Nesheiwat] with a civil lawsuit unless he agreed to pay you money" and "you abused your superior position of power and authority to pressure an employee of lower rank and authority to pay you $10,000 secretly").) Batten's demotion letter notes Nesheiwat's subordinate position, and states that Gibbs "threatened him with a civil lawsuit unless he agreed to pay [her] money," "engaged in adversarial settlement negotiations with Nesheiwat," and "did not stop pressuring him until he agreed to offer you $10,000." (*Id.*) Both letters state that Gibbs "abused [her] superior position of power and authority to pressure an employee of lower rank and authority to pay [her] $10,000 secretly" (*Id.*)

At the hearing, however, Hooper seemingly backed off of the grounds stated in the letter. Hooper stated that he "did not factor in at all her decision to pursue a private remedy against Nesheiwat in [his] decision to demote" and

---

[17]   For example, the arbitrator in the earlier case found that USPS could easily have begun its disciplinary investigation earlier. (See, e.g., DE 59-3 at 4–5.) Here, by contrast, USPS began its investigation as soon as it learned of the misconduct. In Gibbs's case, USPS expressed concern about the strength of the evidence that the harassment incident occurred, and Nesheiwat's confession was part and parcel of the alleged shakedown, or extortion.

that he "didn't hold that against her." (MSPB Tr. at 146:25–147:10.) It is possible to reconcile the two versions; Gibbs's "decision to pursue a private remedy" is not the same thing as her (in USPS's version) extortion of a secret, $10,000 settlement from a subordinate employee. Still, there does seem to have been at least a shifting of focus.

As part of its extortion theory, USPS now cites Gibbs's alleged threat to have her husband beat up Nesheiwat or to have him fired. The demotion letters, however, do not. (DSOMF ¶¶ 27–29.)

A jury might or might not interpret the foregoing as a post hoc attempt to rehabilitate the actual grounds for dismissal. The issue is a factual one.

*       *       *

Multiple issues of fact are presented by this evidentiary record. I will therefore thus **DENY** the motion of USPS for summary judgment on Gibbs's retaliation claim.

### C. Gibbs's Discrimination Claim

Title VII makes it illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination cases are also analyzed under the *McDonnell Douglas* burden shifting framework. *See Stewart v. Rutgers Univ.*, 120 F.3d 426, 432 (3d Cir. 1997).

### 1. Gibbs's Prima Facie Case

To prove a prima facie case of sex discrimination, Gibbs must show: (1) she belongs to a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances support an inference of unlawful discrimination. *Hicks v. New Jersey Dep't of Corrections*, 2019 WL 5587324 at *4 (D.N.J. Oct. 30, 2019) (citing *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018)). Gibbs may prove discriminatory animus by either direct or circumstantial evidence. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983).

The parties do not dispute that Gibbs belongs to a protected class by virtue of her sex, that she was qualified for her position, or that her demotion was an adverse employment action. The only remaining question is whether the circumstances support an inference of unlawful discrimination.

Gibbs asserts that the circumstances indicate that she faced discrimination based on a comparator analysis, *i.e.,* that she received less favorable treatment than a similarly situated male employee. (Opp. at 13 (quoting *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1997).) The similarly situated employee, she says, is Nesheiwat. (*Id.*)

The traditional comparator mode of analysis is a poor fit here. The premise of that analysis is that two employees were comparable in every way except for their sex, but were treated differently, suggesting that discrimination must have been the reason.

Gibbs and Nesheiwat, however, are not similarly situated individuals for purposes of Title VII. "[C]omparator employees must be similarly situated in all relevant respects." *Wilcher*, 441 Fed. App'x at 882. "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Id.* If a comparator employee is different even "with respect to at least one relevant factor," they are not sufficient to ground a claim. *Id.*

Gibbs and Nesheiwat are simply too dissimilar. Nesheiwat was a letter carrier, while Gibbs was a supervisor. Nesheiwat allegedly committed sexual harassment while Gibbs allegedly failed to report it and allegedly coerced him into paying her a settlement. Gibbs was under Batten and Hooper's command, while Nesheiwat was subject to a different disciplinary authority. (MSPB Tr. at 148:23–149:1 (Hooper answering questioning: Q: "So if there's an instance where a letter carrier should be disciplined whose responsibility is it to initiate discipline?" A: "The supervisor." Q: "And in your role as District Manager . . . do you have any responsibility to initiate a proposed discipline for a craft

43

employee?" A: "No.") While the question of whether two employees are similarly situated is generally one for a jury, I must nevertheless evaluate whether there is sufficient evidence that a reasonable jury could conclude that similarity exists. *See Andujar v. Gen. Nutrition Corp.*, 2018 WL 1087494 at *5–6 (D.N.J. Feb. 28, 2018). Such evidence is lacking here,

Showing disparate treatment of similarly situated employees, however, is not the only means by which a Title VII plaintiff can prove a prima facie case. The larger issue is whether the plaintiff can "point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [discrimination] was a motivating or determinative factor in the employment decision." *Simpson v. Kay Jewelers*, 142 F.3d 639, 644–45 (3d Cir. 1998).[18]

Gibbs's claim is not that she and Nesheiwat committed similar misconduct but were treated differently. Rather, she makes the *a fortiori* claim that USPS decided to punish her, an innocent victim of sexual harassment, rather than Nesheiwat, the perpetrator. That, she says, is evidence of discrimination. Now of course it may be perfectly legitimate to treat an accuser and an accused differently, depending on the merits of the case. But taking

---

[18] *See also Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) (the prima facie test is flexible and must be tailored to fit the specific context in which it is applied). That evidence can, but need not, take the form of inferences from the treatment of similarly situated employees. *See Simpson*, 142 F.3d at 645 ("*For example*, the plaintiff may show . . . that the employer has treated more favorably similarly situated persons not within the protected class."); *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (Sarullo "has not claimed that employees who are not Native American have been rehired after having criminal charges dismissed. Although he need not establish that precise type of disparate treatment to establish a claim of discrimination, he must establish some causal nexus between his membership in a protected class and the decision not to rehire him.") (emphasis added); *see also In re Tribune Media Company*, 902 F.3d at 402 (fourth prong only requires "circumstances that support an inference of unlawful discrimination"); *Bullock v. Children's Hosp. of Phil.*, 71 F. Supp. 2d 482, 488 (E.D. Pa. 1999) (prima facie case only requires "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion" and "is not limited to showing that . . . other similarly situated employees outside of the relevant class were treated more favorably.") (citing *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 355–59 (3d Cir. 1999)).

Gibbs's version of the facts surrounding the harassment incident as true, she is correct that circumstances might raise an inference of discrimination.

Viewing the facts most favorably to Gibbs, she was sexually harassed by a coworker.[19] She then reported the harassment to her coworkers and the EEO, substantially—if not technically—complying with her obligation to report harassment. Having been informed that she had no claim through the EEO, and having received no support from her coworkers, she threatened a civil suit against the perpetrator. The perpetrator then admitted that he committed the harassment in a signed settlement with Gibbs. Then Gibbs, but not the perpetrator, was disciplined, and USPS then took the extraordinary action of attempting to recover $10,000 from Gibbs to recoup its losses in arbitration with the perpetrator.

On its own view of the evidence, USPS's actions were justified. The evidence of harassment was weak; Gibbs's self-help in lieu of a formal complaint was inappropriate; the $10,000 represented proceeds of that inappropriate conduct; and USPS believed, for reasons having nothing to do with discrimination, that her conduct toward this subordinate employee implied unfitness to be a supervisor.

On the other hand, a fact finder could view the facts, as presented by Gibbs, as evidence of discriminatory intent. USPS's decisions could be viewed as a refusal to credit or take seriously a female victim's complaint of sexual harassment, or a predisposition to side with the male alleged harasser. Viewed in that light, USPS's decision to demote Gibbs could be seen as an expression or implementation of that discriminatory attitude. (PSOMF ¶¶ 79–83.)

I find sufficient issues of fact to deny summary judgment on the issue of a prima facie case.

---

[19] Of course, it is a disputed fact whether Nesheiwat did in fact harass Gibbs, but there is enough evidence in the record, including Gibbs's own testimony and Nesheiwat's admission in connection with the settlement, to support a fact finder's conclusion that he did. Now, USPS seeks to dispute whether Nesheiwat committed the assault. (*See, e.g.,* DRSOMF ¶ 9.) Neither Hooper nor Batten, however, expressed a conclusion as to Nesheiwat's culpability in their demotion letters.

**2. USPS's Asserted Non-Discriminatory Reason and Gibbs's Proof of Pretext**

I turn to the second and third *McDonnell-Douglas* factors. As noted in relation to the retaliation claim, *see* Section III.B.2, *supra*, USPS states that it demoted Gibbs because she coerced Nesheiwat into settling and because she failed to report the harassment. But, as also noted in the retaliation section, *see* Section III.B.3, I find evidence that could support a finding that the stated reasons for demotion were pretextual.

Since there is evidence of pretext, I must deny USPS's motion for summary judgment on the discrimination claim as well.

**IV.   CONCLUSION**

For the foregoing reasons, USPS's motion for summary judgment is denied as to both the Title VII retaliation claim and the sex discrimination claim. An appropriate order accompanies this opinion.

Dated: August 18, 2021

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

46